Argued January 8, affirmed March 11, petition for
rehearing denied June 23, 1964

## STATE OF OREGON *v.* HAMBLETON
390 P. 2d 184

*Francis F. Yunker,* Portland, argued the cause for
appellant. On the brief was George A. Haslett, Jr.,
Portland.

*Desmond Connall,* Deputy District Attorney, Port-

land, argued the cause for respondent. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Before McAllister, Chief Justice, and Rossman, Sloan, Goodwin and Lusk, Justices.

ROSSMAN, J.

This is an appeal by Steven R. Hambleton, defendant, from a judgment of the circuit court, based upon a jury's verdict, which adjudged him guilty of the Crime of Assault and Robbery While Armed With a Dangerous Weapon.

The defendant presents these two assignments of error:

1. "The court erred in denying the defendant's motion for acquittal.

(At that point the defendant quotes his motion.)

2. "The court on examination of witness Richard D. Stevens, erred in failing to sustain an objection to the following question.

" 'Q Well, I show you State's Exhibit No. 32 marked for identification and ask you whether or not your name appears thereon?　*　*　*

" 'MR. HASLETT: May it please the Court, I would object to any further questioning along this line. This is counsel's own witness. I don't know whether or not he is going to impeach his own witness; but if he is, he must show some surprise or something.'

" 'THE COURT: Well, I don't think it was objected to as to the form of the question. So, I can't give you a continuing objection. But, as to the objection that this witness cannot be impeached, that is overruled.' "

In November of 1961 a tavern known as Cozy Inn was operated in Portland by its owners, Mrs. Margurite Burke and a brother of hers. At 11 p.m. on November 21 there were five customers in the tavern, and Mrs. Burke was the only one in charge of the place. Two men then entered the tavern, according to the state, and at the point of a pistol held to Mrs. Burke's head by one of the two—Richard D. Stevens—robbed her of the money in the tavern's cash register, $68. Thereafter, this defendant and Stevens were jointly indicted for the crime. Before the defendant's trial Stevens had been found guilty and sentence had been imposed upon him. In the case against this defendant, Stevens testified that he alone committed the crime and that this defendant took no part in it. According to the defendant, he was home on the evening of November 21, 1961, with the exception of a few minutes spent in making a trip to a near-by store. His home was a few blocks form the Cozy Inn tavern. The defendant testified that he did not participate in the robbery of the tavern. Mrs. Burke was unable to identify him as the companion of Stevens in the robbery of the tavern. No one supported the defendant's claim that he was home the night of the robbery.

We will now consider the first assignment of error.

The defendant lived in rented quarters which he obtained from one Donald L. Murphy who also lived in the structure. The witnesses referred to the latter as a two-story duplex or apartment. Murphy did not own the place and was himself a tenant. Stevens, whom we have mentioned, stayed in the place at times.

Mrs. Burke, after describing the manner in which the two men entered her tavern, swore that after their entry she found herself at the cash register with

Stevens standing beside her and pointing a pistol to her head. The pistol was of 22 caliber. According to Mrs. Burke, Stevens—by the threat of the gun that he held—demanded that she give him the contents of the cash register. She swore that she thereupon placed the contents, $68, in a paper bag which she said was known under the trade name of Rock Kraft. Then, according to her further testimony, she handed the paper bag and its contents to Stevens. Mrs. Burke testified that her tavern had a supply of Rock Kraft bags; she gave one of them to the officers who came to the tavern after the robbery; it is an exhibit. The bag in which Mrs. Burke placed the money is also an exhibit; it was obtained from the defendant's home. The two bags are alike, and Mrs. Burke, as a witness, identified them. Although Stevens, according to his testimony and that of Mrs. Burke, carried a pistol, the other alleged robber—whom the state claims was this defendant—had no gun. Mrs. Burke claimed that the second robber gave attention to the customers in the place while she complied with Stevens' orders. She swore that the second robber, who the state claims was this defendant, wore "a white jacket." When she had handed the paper bag containing the money to Stevens, the two men left the tavern and entered an automobile which she described in these words: "It was a light-colored—it was a Plymouth or a Chevrolet, old one." The car had stood in front of her tavern while the robbery was under way. The two men drove away in it.

We have mentioned that Mrs. Burke was unable to identify the defendant as the second man who participated in the crime. Her words were "I'm not sure." She had the impression that the defendant "is shorter" than the second participant in the crime.

Murphy owned a light-colored Chevrolet automobile which he permitted Stevens and the defendant to use in the late afternoon of November 21, 1961. In fact, about 6:00 or 6:30 p.m. of November 21, 1961, Stevens, in Murphy's car, called for the defendant at the tavern where he worked and drove him home. Mrs. Burke, when shown a photograph of Murphy's car, testified that its appearance was similar to that of the one in which the two robbers left her tavern. Police officers swore that a few minutes after the robbery they placed the defendant's home under surveillance. Ten minutes later, so they swore, they saw a light-colored 1952 Chevrolet, driven by a man, emerge from a basement garage that was under the defendant's home. The officers took in its pursuit and, driving at high rates of speed, four times sought to stop the fleeing car. Their efforts failed and the car eluded them. Shortly thereafter the officers found it in a wrecked condition not far from the place where it had escaped from their sight. No one was in the car at that time. One of the officers testified, "I saw a couple of 22 shells laying on the seat and a pair of gloves." About an hour after the robbery, officers came to the defendant's home and were permitted to enter. In the course of the visit they asked the defendant whether he possessed a white jacket. He showed them his. The officers took possession of it. Mrs. Burke, as a witness, upon being shown the defendant's jacket, testified that it "could be the same jacket," that is, the one worn by the second robber.

We have mentioned that a few minutes after the robbery police officers went to the defendant's home and were admitted by the defendant and his wife. When the officers asked the defendant whether he possessed a weapon, he answered that he had a 22 re-

volver and that he generally kept it in the closet of his bedroom. He took the officers to the bedroom and showed them the empty holster; he explained that the gun had been in the holster earlier that evening. In the white jacket that the defendant handed the officers they found, according to their testimony, "numerous 22 rounds." About one a.m. of November 22, 1961, the defendant was placed under arrest.

According to Murphy, at about one a.m. of November 22 he received a telephone call from Stevens requesting him to come in a taxicab to the street intersection in Portland which Stevens' telephone call mentioned. The intersection was not far from the place where the police found the wrecked Chevrolet. Murphy complied with Stevens' request and upon so doing Stevens entered the taxicab. Next, the two men entered a tavern known as the Calico Cat. While there Murphy observed upon the stool next to the one upon which Stevens was seated a bundle of clothing. He swore that he assumed that the bundle belonged to Stevens. When the two men left the Calico Cat and entered a taxicab, Murphy took the bundle with him.

About 3 a.m. on November 22, 1961, a police officer (Stowers) who had had no connection whatever with the investigation of this crime, and who was wholly unacquainted with Murphy and Stevens, encountered them in a distant part of the city and became suspicious of their movements. Murphy carried a bundle of clothing and when Stowers shortly demanded that both men place their hands upon the roof of the automobile there fell out of the bundle of clothing a pistol. It was of 22 caliber and became an exhibit in this case. According to Stowers, the pistol was loaded with nine rounds. When the defendant was a witness in his own behalf, his counsel showed him the pistol just de-

scribed; the defendant, referring to it, said "It looks like my gun." When the gun was shown to Mrs. Burke and she was asked whether it was the pistol that Stevens had pointed at her head, she answered, "It looks like it, yes." The entries in the records of a pawn broker show that the defendant had pawned the pistol just mentioned more than once. From the foregoing we see that Murphy picked up Stevens at a place not far from the wrecked Chevrolet and presently had in his possession the pistol which Stevens had held to the head of Mrs. Burke in conducting the robbery.

By the early morning of November 22, 1961, both the defendant and Stevens were in jail. About 9 a.m. of that morning Walter A. Green, a member of the police department's detective branch, in company with another detective and a member of the Women's Division, called at the defendant's home and were admitted by the defendant's wife. We now quote from Green's testimony:

"A  After entering the house, I followed Mrs. Hambleton to the rear of the main floor, up the steps to the bathroom, which is at the rear of the upstairs. She entered the bathroom, reached into a clothes hamper, took a paper sack that had money in it, silver and currency—

"Q  And before you go on—

"A  —and handed it to me.

"MR. CONNALL: O.K., let's get this thing identified.

"Q  I hand you State's Exhibit No. 47 marked for identification and ask you whether or not that is the paper bag she handed you with the coins in it?

"A  Yes, it is.

"Q  O.K., where is the—I have got two little envelopes. How do you know that to be true?

"A  It has her signature on it and also my name.

"Q  O.K.  Now, what else did she do at that time, if anything; was there something about some currency?

"A  Yes, I then followed her into, into her room, her bedroom. She took $9.00 in currency from her purse and also handed that to me. At that time she initialed a $5.00 bill."

Green's testimony is free from controversy. There is no contention that the paper sack and the money delivered by the defendant's wife to the officers were not the paper sack and the money which Stevens swore he obtained from Mrs. Burke at the time of the robbery.

On the morning of November 22, after the defendant had been placed in jail, he became acquainted with a cell-mate by the name of Gurney C. Howard who was awaiting trial on a charge of involuntary manslaughter arising out of a hunting trip. Howard testified:

"A  Yes, We didn't know what the subject or how the subject was brought up, but I made the remark that I had a good friend that owned a tavern out on Broadway; and the defendant wanted to know what tavern it was or whereabouts on Broadway. I told him 23rd and 24th on Broadway and the Cozy Inn. Why, he says, 'That's the, that's the one we held up.'

*      *      *

"Q  After you had had this conversation with the defendant when he told you that the Cozy Inn was the bar or inn that they, he had held up, did you have any further conversation with him re-

garding the barmaid or the bartender who was there when he held it up?

*     *     *

"A He made the remark that, or he wanted to know who the barmaid, the dark-haired barmaid was; that she was sure cool."

After Green and his companion officers had recieved from the defendant's wife the paper bag containing the money, the defendant was brought to their office. The following is in part Green's description of what then occurred:

"* * * My partner and I were sitting there talking to him about the Cozy Inn hold-up. We had the sack of money with us which I had shown him, and I then asked him if he wants to tell us about it if he had any part in it. At that time he said, 'I participated.' * * *"

As previously stated, we are now considering the first assignment of error. The part of the assignment which states its basis reads:

"* * * there is not sufficient evidence to take this matter to the jury and to establish the material allegations of this indictment. There is no corroborative testimony to the alleged admission * * *."

■ The defendant was the owner of the pistol which was held to the head of Mrs. Burke. The pistol was absent from its holster during the robbery. About two hours after the robbery the pistol was in the possession of Murphy and Stevens. One of the robbers wore a white jacket—the defendant possessed a garment of that kind and in its pockets the police found shells suitable for his gun. The defendant told his cell-mate, Howard, that he had robbed this tavern and made to

Detective Green a statement to like effect—that is, that he had "participated" in the robbery. About four hours before the robbery occurred the defendant was in the automobile that later drove the robbers to and away from the scene of the crime. About a half-hour after the robbery had taken place, the automobile which had been used in its commission was parked underneath the defendants' living quarters. At this same time the loot from the robbery was in part in the defendant's bathroom and in part in the possession of the defendant's wife.

We are convinced that this assignment of error lacks merit. It is not our duty to weigh the evidence and determine whether it convinces the mind beyond a reasonable doubt. Our sole duty is to determine whether or not evidence of the above kind is in the record and whether it is of substantial character. The cogency of the evidence is for the jury's determination.

We have quoted the second assignment of error and will now consider it. It will be recalled that this assignment of error refers to a document identified as "State's Exhibit No. 32 marked for identification." The document was not received in evidence; it did not become an exhibit; it is not a part of the record and is not before us. The evidence indicates that the paper just mentioned bears the signature of Stevens and that it purports to be a statement made by him to police officers who questioned him after his arrest. Stevens claims that the officers dealt with him unfairly and that he should not be bound by the contents of the paper.

Stevens was called to the witness stand by the state and, in answer to questions submitted to him by

the district attorney, made answers which the district attorney contended were contrary to his previous statements.

ORS 45.610 reads:

"A witness may be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places and persons present, and he shall be asked whether he made the statements, and if so, allowed to explain them. If the statements be in writing, they shall be shown to the witness before any question is put to him concerning them."

The sole ruling contained in the order quoted in the second assignment of error is, "But, as to the objection that this witness cannot be impeached, that is overruled." That ruling is clearly correct. We know of no reason for going beyond the ruling. We therefore find that this assignment of error dicloses no merit.

The challenged judgment of the circuit court is affirmed.